Thank you, Your Honor. May it please the Court, Denise Young and Julie Hall on behalf of Petitioner Ron Williams. We are here today because Ron Williams has yet to receive the due process that the Constitution promised him, a fair trial and a fair sentencing. A great number of issues resulted from the trial and sentencing he did receive where little evidence connected him to the crime. I want to focus today on two issues. As I said, there are a number of issues in this case, but the time we have allowed won't permit discussion of all of them. So the two issues I wanted to talk about today was the eyewitness identification by Elizabeth Totkus and the unconstitutional death sentence that Mr. Williams received and the related issues surrounding that. And I actually want to reverse the order because the facts about his death sentence are so unusual. We see these kinds of claims. I know you see these kinds of claims all the time, that the Court didn't adhere. This is a time when Arizona had judge sentencing. As you know, it only recently changed. But I'm sure you've seen claims before where the argument is that the judge failed to consider mitigation. Well, this is a claim where that argument is the facts here are clear. The judge failed to consider, to give effect to mitigation. Is that just because he said there's no mitigating evidence? Yes. Yes. Isn't that just a linguistic formulation, meaning I don't buy any? There's none that persuades me. There is no mitigating evidence. In my view, to weigh against it, it's not as if he said, I'm excluding all of it and therefore not considering it. You're right. He didn't exclude it. He allowed that evidence to be presented, but he specifically said, this is not mitigating. These are not mitigating circumstances. I don't know how else you say it. I mean, you say he put in a lot of mitigating evidence, but it's not mitigating. That is, it doesn't work for me. I don't know how else you say it. I mean, I think you've got some really powerful arguments on the sentencing side, but that one seems to me to be just doesn't go anywhere. It's a linguistic problem. And I disagree. I beg to disagree, Your Honor. It's not a linguistic problem, because when a sentencer is looking at evidence and determining whether or not it is mitigating in order to put it in the scale. Remember, we start out with a scale of aggravation and mitigation, and once the aggravation is found, that scale goes up on the death side. Now we have to see what's going to be put into the scale on the mitigation side. And Mr. Williams presented powerful evidence about mitigating the two prior convictions that the judge accepted as true at the Arizona Supreme Court. Quite exactly. He accepted the evidence. He just didn't find that it got anywhere. Well, let's look at the evidence then. The Arizona Supreme Court very clearly stated that the facts of this crime alone did not justify a death sentence. The facts of this crime alone was that the victim unfortunately interrupted a burglar in the midst of burglarizing a home. The burglar turned, shot him once, and he died. The Arizona Supreme Court said those facts don't justify a death sentence. So what justified a death sentence, they also said, were the two prior convictions. Mr. Williams had two prior murder convictions. Well, what Mr. Williams presented as evidence was that in the 1976 prior murder conviction, that conviction was based on the testimony of Jerry Likens, who admitted that he lied and framed Mr. Williams in exchange for lenient treatment on his own criminal problems that he had. The judge said, I accept that as true. That means he didn't, Mr. Williams didn't commit that crime. We've got that for one aggravating circumstance. The second aggravating, second prior conviction that was used as an aggravating circumstance was the escape when Mr. Williams left the escape from the West Virginia prison along with 14, 15 other prisoners, where he was serving time for a crime he didn't commit. He escapes, and during that, he committed the escape, and he was part and parcel of the murder. And the judge wasn't under any misapprehension that he didn't pull the trigger. Yes, but he wasn't, the judge didn't find that he was part and parcel of the murder. In fact, the evidence was that Mr. Williams, he was convicted of the murder, but nobody was under the misapprehension that he was actually the one who pulled the trigger. Yes. Okay. Yes. So you had that. You had other prior incidents of violence that it was okay for the judge to consider. So tell me why, even apart from the murder on which he was framed, there wasn't evidence to support the sentence. Because what the Arizona Supreme Court said, now, we have a judge who makes a decision, and then that decision gets appealed to the Arizona Supreme Court. They then take a look at it and can decide yay or nay in it. And what the Arizona Supreme Court says is we find this sentence is just, the death sentence is justified because of his prior convictions. Well, he had just proven that he had not killed anybody in those prior convictions. The judge had accepted that as a fact. And the other barrier that the trial judge erected in this case had to do, that was, we've just talked about the first category of evidence that Mr. Williams presented. There was a second category of evidence that Mr. Williams presented, and that had to do with what you probably, we have all seen a lot, I call classic mitigation. It's backward-looking mitigation. Tell us about you. What happened to you? Tell us about your life. He presented very, very powerful evidence about the severe poverty in which he was raised, the alcoholism of his family, serious mental illnesses suffered by both paternal and maternal sides of the family, his  mother knocking him out with a hammer at age ten, refusing to let him in the house so that Mr. Williams has to go find shelter at age seven, age eight, at his grandfather's house where his uncle lives, and the two of them are robbers, burglars, thieves, and they're quite happy to get the little child to help them get their stolen property easier. Mr. Williams suffered illnesses as a  child. He was depressed. He was involuntarily committed to a mental hospital. They diagnosed him as suffering from schizophrenia and depression. This is all evidence that was not rebutted, and what the judge said was that none of this was mitigating because he committed a crime after that happened. Well, that violates constitutionally erroneous about that. It violates the Eighth Amendment because the Eighth Amendment requires that any basis, any reason for a sentence less than death is relevant. Here's my question. He didn't say it wasn't relevant. He said it doesn't mitigate the for me. So what's unconstitutional about that? It may be wrong. I mean, clearly you disagree with the outcome, but what's unconstitutional about it? Because the Eighth Amendment says that the sentencer has to consider relevant mitigation. They can't erect their own personal barriers, you know? I think we're going to have to maybe agree to disagree on that as to what consideration means in this context. But could you talk a little bit about what the record shows with respect to other mitigation witnesses who were not furnished travel and also what the record shows now in collateral review with respect to what investigation might have funds for an investigator might have shown? Yes. Yes, Your Honor. Thank you. I would be happy to. Part in parcel with this claim is the judge is not and I know we all disagree, but my position, the judge is not understanding what mitigation was. He denied Mr. Williams the funds to bring in witnesses because what he said Well, the witnesses that he wanted to bring in, the judge said he would submit is more in Williams' favor than not because those folks, what they said was accepted as true, instead of being subjected to cross-examination, which would have probably cut them up. In fact, I forget what difference that makes, and you have already acknowledged he presented a very powerful case in mitigation. So what's, what would they have added to the mix? I mean, it was accepted as true without being in any way undermined by cross. Well, first of all, what happens, and yes, he did present a powerful case in mitigation, but no mitigating circumstances were found. And I know we have to, we disagree on that. But there are quotes in both the Supreme Court and in the judge's verdict on that. But he requested witnesses to come and to testify after a full investigation had been done. So what we have here, because of the judge's denial of funds, is we have an investigator on the phone calling people and saying, so what do you got to say? Anything that he said that they would have said, the judge accepted as true. But what I, but we, if in fact he had been, if in fact he had provided funds to go out and actually investigate, he would have uncovered a wealth of information that those, that's the type of information that we have in our excerpt of record, and they are declarations from Mr. Williams' uncle, who needed the money to come out to talk about the family and what life was like, from Mr. Williams' brother, who needed the money to come out to talk about what would have happened. What evidence is there that they would have said something different from the, as you say, powerful evidence that Williams himself was able to adduce about his background and the effect that it had on him as a kid and as an adult? I can tell you a little bit of what each of them talked about, and what they did, and I think what we need to think about is it's one thing to have Mr. Williams, which is what had to happen here, because the judge said, I don't want to hear from anybody that hasn't seen you in the last ten years, I don't want to hear from anybody from your childhood, because the fact that you hadn't murdered somebody in high school, I don't want to hear from them. That's wrong. That's not my point. Now, what I'm focusing in on is if he had had everything that you say he should have had available to him, what would it have produced? So we can make a determination of had that been in the mix, would it have made any difference? It would have fleshed out, just like what happened in Rompilla, it would have fleshed out Mr. Williams' background. He would have had his uncle and his cousin to talk about what and to really bring to life what Mr. Williams' experiences had been growing up, how those experiences were so detrimental. You're saying you're different from what you have just you just went through the litany a minute ago very clearly. Yes, it is. It talks about in detail, much more in detail about the family members, the drinking problems, the bootlegging, the crimes, the... Well, that doesn't add anything to what you've already described that was in evidence. I'm sorry I'm not describing it well enough for you. I've read the stuff. I don't see where it adds anything. That's why I'm just trying to get you to explain to me why you think it adds something that could have made a difference or that would have made a difference. Let me try this. I can sit here and describe this, what are in these declarations. As you said, you read it. I can sit here and describe it. Or let me give an analogy. I could describe a painting to you. A beautiful, beautiful painting. And I could go on and on and on and on. And you would say, sounds okay. Then I go get the Mona Lisa and I bring it in. And you get to see the Mona Lisa. I still get a portrait of what it is. I mean, Williams himself was there. Williams put on all of this stuff in an incredibly articulate way. This isn't like your typical sentencing case where you're saying witnesses could have come if the lawyer had been diligent in pursuing leads that were available to him. Here, the guy himself was his own best advocate and made a tremendous case, as you said, a very powerful one for mitigation on account of his abusive background. What else was there about his abusive background that anybody could have testified to? The facts in here about his background are much more detailed about what happened. It's so that you know, so that you look at it and you know it to be true. They talk about the various, the insanity that has affected the family, the mental illness that's affected the family, who it is. It's Jimmy Ray. It's Alex. They talk about what life was like growing up in that poor little town. To think, it's simply unfair to deny funds for an investigator and a full social history investigation that we know the ABA guidelines require. They require that because Mr. Williams isn't an investigator. He's not a social historian. And how awful, how horrible that he had to get up there and say, well, I think this person would say this. I think this person would say this. At one point, the judge interrupted him and said, well, I don't know why we need your brother here. You should know. You were in the same family. You should know everything there is to know. That's not that violates the Constitution. Where was his brother? They were in West Virginia. This is a poor, tiny, it's Welch, West Virginia. It is a poor, tiny coal mining town where nobody has funds to do anything. And yet the judge repeatedly restricted it. He wouldn't let his mother, he wouldn't pay to have his mother come out. Now what a mother could say we know what she would have said. And what I disagree with that, Your Honor, is we have an investigator on the phone saying, so what do you got to say? She doesn't know. What you have is you have a lawyer, you sit down with the in-person, you have a mitigation specialist, and you mine their history. They, lay people, we all know what mitigation is. And I'm just going around and talking. Could I direct your attention to a couple of other issues that haven't been mentioned that have been of some concern to me? I'd like to hear your position on them before I hear the government's position. One is, was there an error in not appointing an independent psychiatrist at the sentencing phase? And if there was, did that affect the sentencing? Was there prejudice from that? And also, was there an error in some way in his pre-sentence interview process? And if so, did that affect the sentencing? Yes, Your Honor. The failure to appoint an independent mental health evaluator did. It was error, and it did affect. How do we know it affects anything? Because to this day, there's no evidence that I can find of what any mental health expert would or could have said that would have made any difference. What we, that is true. There isn't an additional evaluation. There is no basis for prejudice. Because what, in fact, came out of those interviews were, and they were the drive, what we call the drive-by interview. They just go in, they sit for an hour, they chat, and they come out and say, I think he's antisocial. That's what, that's what the harm was. And he, you know, obviously, Dr. Dean, the one expert, the state's expert, said, he's not psychotic and he's not competent. Those were useless evaluations. A good expert, that's your opinion, and I value it, but it's not an expert, expert opinion saying that. So what I was asking, and maybe I didn't ask it very well, is I couldn't find, even until now, any evidence that would have shown what some other neutral expert, some other independent expert, excuse me, would have said that would have made any difference. And that's right, Your Honor, that we do not have a present evaluation of Mr. Williams. It's speculative, isn't it, to say that he was prejudiced? The prejudice, Your Honor, was the harm from what these two doctors said. That's the prejudice. And had he had- We know that it's not absolutely 100% correct. Well, we know that what we do have are old evaluations predating this evaluation, which very much contradicts what these doctors said in their one hours. And these were evaluations where Mr. Williams was actually committed to their facility, and certainly carries a lot more weight. How about the pre-sentence interview? I understand that there's a Miranda issue? Yes, Your Honor, there is a Miranda. Did it have any effect on the sentencing? That's a prejudiced question. Like, I was on that Hoffman panel. I do, I remember that- Yes. We said there had to be a lawyer at a pre-sentence interview. Yes. I don't quite remember what we said about Miranda. I'll take another look at it. But assuming that he had to get Miranda warnings before that interview, and they weren't given, what did he say in the pre-sentence interview that would have affected, would have prejudiced him here, that would be a basis to require a new sentencing procedure? The, just a moment. I'm sorry, I was looking to see if we could have the, if we had the pre-sentence interview really quickly for me to take a look at, and I'm sorry. You could take a look at it while your colleague is arguing. Yes, yes. I absolutely apologize for that. I know the conclusions that reached by the pre-sentence officer were horrible, were very damaging. While you're looking, just to add a slight twist to Judge Gould's question, what was induced in the pre-sentence report that wasn't already in the trial record? Anyway, that would have- That's consistent with my question. Yes. It's just a slightly different question. While you're thinking about it, just- I absolutely will, and I apologize that I don't. As I said, there were a great number of issues in this case, and I should have looked more closely at that one. There are so many issues, it's hard to, on everyone, but we want to give them all a proper consideration. I was also interested in the issue about one of the witnesses who wasn't permitted to funding, the travel wasn't funded. This may be in the guilt phase of the trial. Leonard Joy was a witness that I guess he wanted to call to. The argument was to testify that his statement when he was in the hospital was involuntary. Yes. Yes. I was having trouble understanding that argument because it seemed that the witness talked to him afterwards, and I didn't see that a statement that he was in shock at a later time would have much bearing on the voluntariness of an earlier statement. And, Your Honor, I think it was a few hours later. It was at his initial appearance, so I'm not sure. I don't think it was even 24 hours. I think it was a few hours later at his initial appearance. He would have testified the great pain that he was suffering, that he didn't seem to be actually competent at that time, wasn't completely cognitive at that time, and obviously the severity of his injuries. Pardon? He saw him after his surgery. Yes, he did. He saw him after his surgery. And so that was the hope was to bring him out to challenge and to talk about the voluntariness of the statement. He also wanted the... The statement was about if I hadn't been framed. I had trouble also understanding why that statement was incriminating. Well, the district court called it a confession. The prosecutor saw it as a confession and told the jury it was a confession. And it's all having to do with two different words. What the... And we have two different people who said that they heard the statement. But if the FBI agent, McLaughlin, said that the statement occurred in the hospital shortly after Mr. Williams had come out of surgery and that a nurse had walked by and said, what's he doing here? And he said he killed a bunch of people down south or he killed some police officers. It switches depending on who you listen to. Mr. Williams mumbled a no, no, no. And he turns, the FBI agent turns and says, what about that old man in Scottsdale? And what Agent McLaughlin says is that Mr. Williams says none of that would have happened. Whereas the only unbiased person to talk about this, which was the EMT personnel in the ambulance who said no, that statement was in the ambulance, and he said none of this would have happened. And so it became none of this being the whole shootout wouldn't have happened, none of this would have happened, I'm sorry, if I hadn't been framed. I didn't finish that. So that Mr. Williams said I was talking about the shootout wouldn't have happened. The that makes it sound as though he's referring to that old man in Scottsdale. So that's the confusion. I wanted to get to the eyewitness testimony, but I see that I am running out of time, so I think I'll reserve it. Thank you. May it please the Court. I'm John Todd. I represent the respondents in this matter. Judge Gould is correct in that Leonard Joy was the federal public defender who didn't see Mr. Williams until after surgery. He had no firsthand knowledge concerning the whole statement episode, and the Court already had the medical records. I do need to apologize to the Court for at least three errors in answering three. It is correct that Mr. Williams disputed that he killed the elderly John Buncheck through the entire trial process, including in the pre-sentence report. What was not in dispute was that the gun that he had purchased in Virginia and was found on him when he was arrested in New York was the gun that had shot John Buncheck. Counsel is also correct that the photo array was six people, not seven, and it did not include Jim McClaskey. And counsel is – I couldn't verify the trial court's statement in 1994 that Williams had been in the system since he was 12 years old. Williams in the record reports that his first contact with the system was when he was 16 or 17, and he and a friend stole the gun. He did also report that he had been stealing things since he was – before he was a teenager, so perhaps that's where the Court got that impression. Going to the question – Can we go back to Leonard Joy for just one second? Sure. So Mr. Joy talked to or observed Mr. Williams after the surgery. Was the statement that was allegedly incriminating about the, you know, this wouldn't have happened or that wouldn't have happened if I hadn't been framed, was that statement also after surgery, or was it pre-surgery? I'm not positive, Your Honor. The statement occurred, I believe, around 2 in the afternoon. It could be that it was after also. Was it 2 and 1 was at 5 or something like that? Right. His contact with Mr. Joy, my understanding from the record, was at 5. The statement was given at 2. Okay, thanks. Sure. Concerning the failure to bring certain witnesses for the mitigation portion of the sentencing, the claim is based on only six witnesses. The declarations from 1997 that are in the record were never presented to the state court, and even though the substance of their information is already in the record, these were declarations that came after the state court proceedings. But the test here is the harmless error, whether there was actual prejudice that substantially affected the court's decision in imposing the death penalty. And I think the record is clear that the court's concern with this, who was 41 at the time of the sentencing, was his life of violence from his early 20s through the time that he was before the court. Well, one of the things that the trial judge certainly said that was wrong is that nothing about his background, basically, nothing that occurred before mattered. And so with that in mind, why wouldn't it have made a difference had some of these witnesses who knew him only as a, you know, young man or child. I think I've lost my own sentence, but you understand what I'm asking. I think you do. I think the judge's position was, based on the record, was that he didn't consider it terribly relevant, this home environment, given the fact that he had been out of the environment for 20-some years. Well, that's psychologically kind of wrong, isn't it? Well, I think unless there is some clear psychological diagnosis that makes him incapable of knowing right from wrong or for somehow lessens his culpability for his acts, it's not wrong. It's common sense. Maybe you didn't understand my sentence. Okay. My question is this. I mean, it's perfectly clear that evidence about someone's childhood and early years bears on litigation. Right. It's something to be considered, absolutely. And the trial judge made some comments with respect to some witnesses. I mean, don't misunderstand me. He did not exclude relevant evidence about background, obviously. That came in through a lot of different people, as counsel summarized. Right. But he did make the statement in connection with some of these five or six material witnesses, or five or six witnesses that he decided weren't material but whose proffer he accepted. Now, my question is, why wasn't that harmful? Because, as I understand, under the Constitution, the state court has the right to, after it considers all the mitigation, to give it weight or not weight. And in doing that process, it can consider the relevancy of the evidence to the crime and to the defendant's character. And as I understand the record, the judge felt that in light of his violent past, his three murder convictions, that he didn't feel that that evidence deserved much weight. And that's my understanding of the record. You know, if the judge had said, in light of his violent past, I'm not going to give that evidence controlling weight, then he could clearly do that. But this case seems to me poses a rather difficult issue. If the judge excludes the evidence, won't let it come in, he clearly can't do that. So what do we do if the judge says, I'm admitting the evidence, but I don't really give it, you know, I'm not going to give it any credence? As I understand, when we're talking about the weighing process, that that is totally a State issue. And what this Court would have to find on this issue is that by the judge not somehow weighing this the way the Court thinks it should, that that is actual prejudice that would have changed the judge's sentence. That's the question. Was it a matter of his giving it, of considering it and weighing it against the other factors as he was supposed to? Or was it a matter of saying you can make your offer of proof, you know, and go argue it up above, but I think it's irrelevant and I'm not going to consider it? I think, no, the judge expressly said he did consider it. He expressly said that. He had before him a person who he had watched for two and a half months. He had just listened to a brilliant closing argument. He understood that this was a brilliant person, but he also understood this was an extremely dangerous person that had been convicted of three separate murders. He had the whole Likin information before him. The Reverend Cook, one of the witnesses that at one point Mr. Williams wanted to bring here had said, yeah, Likin did tell me that, but I didn't believe him. I mean, Likin, I believe what Likin was saying was simply that he lied when he said that Ron Williams had confessed to him. He didn't know anything about the crime itself. So this was a dangerous person. He had a history of violent crimes. And from a fair reading of the record seems to say that while he might have had a bad childhood, that that does not excuse his violent past. But it continues to he's in his 40s and that the death sentence is appropriate for this type of individual. And I think that's what the Arizona Supreme Court in their independent review said the same thing. True, they said the facts of this crime doesn't make it a death penalty case, but his prior criminal history does. How about the Is there an what was there an error in I'm changing the subject here. I appreciate your argument and response on that. Last one. Is there an error in not appointing an independent psychiatrist when if he's put mental status or health in issue and then assuming there was a technical error at least, is there an error that caused prejudice in any way? And what's the state's position on that? Your Honor, I believe the district court found that there was no no error because he had not made a showing for sentencing that his mental status was going to be an issue in terms of sentencing. As you recall in the eight case which came out in 85, that the prosecution had put on psychiatric evidence to prove future dangerousness. And it was unfair that the defendant didn't have his own mental health expert to combat that. In this case, it was Williams who requested to have a mental health evaluation. And he and the court appointed a mental health expert for him. They appointed a mental health expert for the state. They both interviewed them. He cooperated much more with the one that was appointed on his behalf. And it's sort of like as Justice Feldman said on another issue in this case, as every experienced trial lawyer knows, investigation carries with it a risk that some evidence obtained may be unfavorable. But the Constitution gives the defendant the right to run the risk, but not protection from the consequences. What the psychologists found, and no mental health expert testified at the mitigation. Reports were certainly submitted to both sides and to the court. And it basically substantiated what was in the record before from the prior psychiatric reports that were in the record. At least one definitely ordered because of a crime. It was court-ordered to have it because of a prior crime. So that was all before the court. But there was, there was, our position is there was no error under AIC, and it certainly was not, there's no actual prejudice. It didn't substantially affect the court's decision in this matter. Okay. How about the pre-sentence? The pre-sentence also. I know in Hoffman we came up with a. Right. And our first. Statement of the law that all the States may not have realized was there before. Right. And changed the law of this circuit in the same time. And our position, of course, is that that's Teague Bard to apply Hoffman to this case. I don't know if we changed anything or not, but in any event, is there prejudice on that? And our position is there was no prejudice. Mr. Williams told the pre-sentence officer what he told the court, what he's told throughout the record, his position, exculpatory. So, no. What about his, what was the situation with respect to his family? With his family? Yeah. In terms of. Where were they? Did he want his mother to testify? What did. Well, he did, one of the witnesses was his mother. He did want his mother to testify. I can't recall. Were there any, was there anybody else? Was it, who did he want to testify for his family who couldn't, who he was denied funds to get? There were six, six people that he, that are part of his claim here. And the, the district court in its judgment goes through each, what each one of them would testify to, and concluded after doing so that it was, would be harmless error under Breck. One of them was his mother. And.  Excuse me. The trial judge accepted the proper, as I recall it. Right. It was his mother, his, one of the former prison guards, formal parole officer, his ex-wife, and the juror in his murder conviction. Right. And his two sisters, too. Well, two sisters talked to the. An argument with respect to them. But he pursues an argument with respect to Williams, who was his mother, Heath, who was his ex-wife.  And then there was the guard, Dawson, the ex-wife, Blakely, the parole officer, and Price, who was the juror in the prior murder trial. Right. Excuse me. Not there. There was a process. Yes. Right. That's correct. I'm sorry, Your Honor. I didn't mean to speak over you. The, the pre-sentence officer included comments from both his sisters. But they weren't, they weren't there. They were not there. But there's no, there's no comment. I guess I'm, I mean, I, I, I guess it, it, why, how, how could it not have been important to have the mother testify when, when there is evidence of a childhood that is filled with abuse by one parent? Well, normally jurors expect mothers to testify on behalf. The pre-sentence officer spoke to other family members. Mr. Todd, I'm not sure you're understanding the question. Okay. I'm sorry. Okay. I mean, I think Judge Froder is saying, look, he wanted his mother to testify. The judge said, you know, and he gave a proffer. Right. Of what his mother and, and Price and, and his ex-wife and whatever would have testified to. Right. And they. He said, I'll take the proffer. But he never saw. He never heard live testimony. So Judge Froder's question to you is why is the absence of live testimony not important? Well, because my understanding of the law is that there is no constitutional requirement at sentencing to have live testimony. That Williams v. New York, who's been cited recently and repeatedly, stands for that proposition. He, the point, the, under the Eighth Amendment, the important thing is that he considered it, and he did. But even, even assuming that the. Consider. He did, he didn't consider the, the mother's presence. He didn't consider her, her reactions to cross-examination. He didn't consider her, the, the, any relationship between the two of them in the courtroom. He didn't, he couldn't see any of that. I, you know, it's just very hard for me. I, I guess I'm the only mother on this panel. But it's really very hard for me to imagine as a judge just sitting there and having somebody describe what a mother might say and, and having that somehow be a substitute for what seeing the mother would be. And he apparently didn't, the judge didn't apparently seem to think that that was important. Well, Your Honor, the, the issue is, was there actual prejudice because she didn't come and testify personally? Yeah. And I'm just saying, would you explain how that could be, that it would, that, that there could, that there could have been no prejudice by having the mother there? Because of the lifestyle that he had demonstrated repeatedly from long after he left his mother. The fact, if his mother had came and testified from this record, there would no be, there would, her, the lack of her in-person testimony, even after he's already accepted what she would say, the, the lack of it would not have, have changed the, had she been there and testified in person, would not have changed the sentence in this case. She would have presumably had knowledge of, of Williams' encounters with law, the law starting back before he was a teenager, right? Right. And I assume that the State would have cross-examined on that. Absolutely. He, he, he had reported that he had been a thief. So is part of your position that the good would have been offset by the bad? Certainly. As, as you had pointed out earlier, by accepting the proffer, the court, in a sense, denied the State the opportunity to cross-examination. Now, Mr. Vance, I mean, he went to West Virginia. It's not like he was just on the telephone. And he had other investigators working with him. They tried to track down Jim McCleskey. So he had a fair opportunity and did produce evidence in litigation. The court just looked at it and didn't, didn't change his mind. Has the Supreme Court ever spoken directly? You mentioned a Williams v. New York case being cited on this point, I think. But has the Supreme Court spoken directly to whether a court accepting a proffer of testimony is sufficient for Eighth Amendment purposes or for due process purposes, as contrasted with having live witnesses there? I'm not. In other words, could a court take a criminal defendant's entire mitigation case and say, okay, I'll take your proffer and I accept it all. We're not going to have any, any witnesses called because I accept your evidence. Now I'll weigh it. Has the Supreme Court talked about that issue? I don't, I'm not familiar with the court ever addressing that. In most states where there is jury sentencing, you're not, that would not be the normal procedure because you would want live witnesses. Judge sentencing is somewhat different. The, but the Williams case, which is a first-degree murder case where the court, the state court against the jury's recommendation imposed death and did it based on pre-sentence report, information outside the record. The U.S. Supreme Court said that's fine. That case has been recited repeatedly and repeatedly and repeatedly. The Mr. Williams counsel noted one case where they felt it somehow called it into question. If you carefully read that case, you'll see it's a fractured opinion. There's only three justices that took the position that somehow Williams, the Eighth Amendment, undermines it. So I would say that there is, at this point in time, as there was back then, no constitutional right under the Eighth Amendment to present live testimony. Okay. Thank you. Is there anything else that concerns the Court that I might assist with? Not from me. I don't think so. Thank you, Your Honor. I'd like to first turn to Judge Gould's question. And I apologize for not being able to tell you a little bit more about the pre-sentence report that you ask about. The prejudice that occurred is that the pre-sentence report, as I said, was not at all favorable towards Mr. Williams. And one of the things that happened is that, like many, many people in this situation, Mr. Williams downplayed the significance of his childhood. Again, we see that often. But those statements were repeated throughout the pre-sentence report where he said, well, sure, my dad drank a little bit, but it wasn't so bad. And so that was part of it. He also talked about, the pre-sentence officer asked him about why he escaped, and he made statements about his escape and, you know, tried to sort of self-analyze. And those were all very harmful statements. So I believe there is no question that there was prejudice of him not being warned, that those statements could be used against him. I want to jump back for just a second to what Mr. Todd just finished with. And the question is, is there a case out there that says you have to allow, as you said, Judge Schroeder, a mother come and plead for her son's life and talk about his background? I don't know that he would have pled for his life. I mean, that's just all speculative. What we know that she would testify to is what the investigator said she would testify to. And we'll assume that that's true. Yes. Yes. And I believe those statements, a reasonable reading of those statements is that she would. She talked about her love for her son in that. If there's a reasonable inference from it, then the judge drew that. But we're going to get back into that on-again, off-again thing because the – I hate to be a stickler on this stuff, but, you know, you can't just speculate. I mean, that's what we've got post-conviction proceedings for is to develop a record about what people would – what would have happened if things had gone down the way you say they should have gone down. And I just keep searching for where that is in this case and some other case, in this case. Okay. And where that is is that we know there was the proffer. There wasn't anything more by the time – Ms. Williams died, and she was alive at the time of this. She died? I am so sorry. I don't know. But she is no longer alive and hasn't been alive for a number of years. So that's why you don't have anything from her. You do have from her son. You do have from nephews and brother. But there is no question, I think, from all of that and from Mr. Vance's testimony about that we can infer. Let me just say real quickly before my time's up. I think rather than those other cases, we can look at the cases having to do with ineffective assistance of counsel that say how important it is in order to get all the family members. And I just throw out Rompila, for example. Thank you very much. Thank you. The matter argued is submitted for decision. And that concludes the Court's calendar for this morning. The Court stands adjourned.
judges: Schroeder, Rymer, Gould